[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION re: DEFENDANT'S APPLICATION FOR EX PARTE TEMPORARY INJUNCTION AND MOTION TO MODIFY CUSTODY POST JUDGMENT DATED FEBRUARY 23, 2001, #181; and PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SOLE CUSTODY and for CROSS NOTION FOR SOLE CUSTODY #186
The defendant in her application for ex parte temporary injunction alleges as follows:
 1. By Order to Show Cause dated this date, the Defendant Mother is instituting a post Judgment action against the Plaintiff for modification of custody as granted in Judgment dated September 25, 2000, and in said action, the Defendant Mother is requesting sole custody of the parties' two minor children and other relief as set forth in the Order to Show Cause.
 2. Upon information and belief, the Defendant Mother has ascertained that the following events have occurred:
 A. The Plaintiff has unilaterally interfered with the minor children's medical care and treatment by directing chat the children may no longer see their existing physician/pediatrician, Dr. Diane Fountas.
 B. The Plaintiff has provided no medical cause or basis to deny the children medical care by this extremely qualified physician. The Plaintiff has never made any compliant regarding Dr. Fountas' medical treatment of the children during their years of treatment with the doctor.
 C. Due to Plaintiff's directive to the doctor, she CT Page 13656 will no longer medically treat the children beyond February 28, despite the fact that the children have to previously made appointments on March 2 and March 13.
 D. Dr. Fountas has instructed another physician to see the daughter Kayla for her March 2, 2001, appointment and has informed the Mother that her office will not honor the appointment for Kyle on March 13, made months ago, as a follow up appointment to monitor a serious REFLUX condition from which the child suffers.
 3. The Defendant believes an ex parte temporary injunction is appropriate to allow the children the opportunity to meet with and be treated by their longstanding physician, Dr. Fountas and to not miss their previously made appointments. In addition, it is likely Defendant's Motion to Modify Custody will extend beyond the February 28, 2001, deadline the doctor has set for any further treatment of the children.
 4. Plaintiff's unilateral actions have severely prejudiced the children by restricting access to their physician as needed, with no cause shown.
 5. The Plaintiff does not have any adequate remedy at law.
 6. No prior application for similar relief has been made.
The defendant's application for ex parte temporary injunction was denied on February 23, 2001, as an evidentiary hearing was required.
The defendant also has filed a motion to modify custody post judgment dated February 23, 2001. That motion alleges as follows:
1. The parties were divorced on September 25, 2000.
 2. The parties have two minor children born issue of the marriage, namely, Kayla Ann Ferrucci born November 5, 1996 and Kyle Robert Ferrucci born June 11, 1999.
 3. Per Article 5.1 of the divorce decree, "The CT Page 13657 parties shall have joint legal custody of the two minor children, physical custody shall be with the Wife."
 4. Since the acceptance of this Agreement, there has been a substantial change of circumstances in that:
 a) The Plaintiff Husband has taken unilateral steps to interfere with the children's existing, effective and successful medical treatment they have received from their pediatrician for over two years; and
 b) He has attempted to interfere with the educational process regarding the minor child Kayla; and
 c) The parties are no longer able to communicate verbally and therefore are unable to discuss the best interest of the children.
The plaintiff in his objections to defendant's motion for sole custody and for cross-motion for sole custody #186 makes the following allegations:
 1. Ms. Ferrucci has refused to work with me on all joint legal custody issues. Ms. Ferrucci has told me and other people that she makes all medical, education, and major decisions since she has primary residence. Since January Ms. Ferrucci has continuously stated to me that if we don't communicate, "I will get sole custody", so therefore I am not going to communicate with you.
 2. Ms. Ferrucci was investigated by DCF for physical and mental abuse to both of our children in January 2001.
 3. Since this incident Ms. Ferrucci has told our children's Doctor that I was calling DCF. Cecelia McCray had told Ms. Ferrucci from DCF that I did not call.
 4. Since Ms. Ferrucci fabricated stories and untruths to Dr. Fountas, the Doctor decided to write a letter to DCF about how Dad was acting inappropriately and that DCF should look into his behavior. Ms. Ferrucci CT Page 13658 sister in law works in Dr. Fountas office.
 5. I never called DCF and Dr. Fountas has met with me twice in two years and knows nothing about me. The first meeting was to review the reflux treatment for Kyle on March 10, 2000. The next time was on 1/29/01 when I met with the Doctor about the untruths that are written in Kayla's medical records about me. I then realized that the Doctor and Ms. Ferrucci are trying to cause irreversible harm with my children to me.
 6. On 2/7/01 I sent a letter to Dr. Fountas and Ms. Ferrucci that I will no longer allow her to treat my children. In my letter to Ms. Ferrucci I explain how I had felt and asked her to pick a doctor and I will pick a Doctor. Then we can decide together on a new Physician. Ms. Ferrucci has refused to communicate.
 7. On 2/13/01 I received a letter from Dr. Fountas that she will no longer treat Kayla and Kyle, as Dr. Fountas feels it is not in the children's best interests.
 8. On 2/16/01 and 2/21/01 two more letters to Ms. Ferrucci stating that I am trying to work with her to find a new Pediatrician for our children.
 9. Since 2/7/01 I have tried to speak with Ms. Ferrucci, the only thing she tells me is that my attorney told me not to discuss these things with you that we will go to court and that Julia Porzio will get her full custody.
 10. Since 2/7/01 I have made at least four phone calls to Attorney Porzio office with no return phone calls. The last time I called I had asked the secretary if she was in and she stated yes. I believe I have tried to call Attorney Porzio to discuss these issues enough times to realize that she does not care about resolving any of these matters.
 11. Ms. Ferrucci will do what ever it takes to interrupt my visitation with my children. She refuses to be reasonable and flexible with visitation. When I have to work or when we had a snow storm Ms. Ferrucci states that I can take them in the snow or CT Page 13659 not take them at all (she will not be flexible) Also on March 17, 2001 Ms. Ferrucci called my home while I had visitation with my children and stated she will be at my ice carving competition with her camera to take pictures of my children. Ms. Ferrucci had left this message on voice mail.
 12. Ms. Ferrucci often gets vocal with me in front of children. The following weekend after DCF met with her, I came to pick up kids and Ms. Ferrucci refused to give me any cloths for the children. She did this in front of our 4-year-old daughter who was then extremely upset that she could not have her own pajamas for the weekend. Ms. Ferrucci has abused the children mentally for the past 14 months with many incidents that are unfortunate for the well being of our children.
 13. "Dr. Fountas stated on March 10, 2000 that reflux is not a serious medical condition". In affidavit dated 2/23/01 Attorney Porzio states a serious reflux medical condition. Noted in Dr. Fountas records dated 12/05/01 Kyle PREVIOUS reflux and eating issues, actually doing great and growing well.
 14. On March 9, 2001 spoke wit Dr. Fountas and asked here to assure me that she will provide medical care if need be until this issue is resolved. Dr. Fountas stated that yes she will and to her knowledge Kyle was not due in until his two-year-old visit. Kyle will be two on June 11, 2001.
 15. Also Ms. Ferrucci has registered Kayla for kindergarten without discussing this matter with myself. After being told by a stranger that my daughter was registered for school I questioned Ms. Ferrucci, she stated that it does not concern me nor does she need my approval.
 16. I am appalled that Porzio is advising her client not to communicate with me to get sole custody for Michele and that she deliberately leaves out facts of this case to this court. According to the rules of professional conduct this is unethical.
Some of the facts that give rise to the above motions are no: in CT Page 13660 dispute. The marriage between the parties was dissolved on September 25, 2000. The parties entered into a separation agreement dated September 25, 2000 and coded 169. Article V of that Agreement captioned Child Custody and Visitation provided as follows:
 5.1 The parties shall have joint legal custody of the two minor children, physical custody shall be with the Wife. The parties shall share in making all major decisions concerning the children, including their education, health and general welfare. Day to day decisions of a routine nature, including but not limited to bedtime, homework, emergency health care, and social and athletic activities customary for children of their age and maturity, shall be made by the parent with whom the children primarily reside. Husband acknowledges and consents to the children attending a Catholic grammar school. Wife agrees that Husband will not have to contribute to the tuition and other expenses of the children's education.
 5.2 The Husband shall have visitation with the minor children every Tuesday from 3:30 p. m. until 7:00 p. m. and alternating Thursdays from 3:30 p. m. until 7:00 p. m. on the weeks he has them overnights. On the weeks he doesn't have the children overnight, he shall have the children on Thursday from 3:30 p. m. until Friday 9:00 a.m. Additionally, the children shall be with the Husband on alternate weekends from Friday 6:00 p. m. until Sunday 5:00 p. m.
 5.3 When each child begins to attend kindergarten, Husband's weekday visitation shall end at 7:00 p. m. His weekend visitation shall remain unchanged.
 5.4 Thanksgiving shall be with the Wife every year until 3:00 p. m. and the Husband shall have them from 3:00 p. m. until Friday 9:00 a.m. Christmas Eve shall alternate yearly. The children shall be with the Husband for the year 2000 until 9:00 p. m. Christmas Day shall alternate yearly. The children shall be with the mother for the year 2000. In the year 2001 and alternating years thereafter, the children shall be with the father from 11:00 a.m. to 9:00 p. m. Christmas Day. Easter shall be with both Husband and Wife. If the Husband has the children the evening before Easter, then he shall return the children by CT Page 13661 3:00 p. m. and if the Wife has the children on the evening before Easter, then the children shall be with the Husband from 3:00 p. m. to 8:00 p. m. on Easter. Memorial Day shall alternate yearly. The children shall be with the Husband for the year 2001. The Fourth of July shall alternate yearly. The children shall be with the Wife for the year 2000. Labor Day shall alternate yearly.
 The children shall be with the mother for the year 2000. New Year's Day shall be split on a yearly basis as follows: 9:00 a.m. until 3:00 p. m. for the parent whom has the children New Year's Eve and 3:00 p. m. to 8:00 p. m. or for a sleepover depending upon the visitation schedule of the other parent. The children shall be with the respective parent for Mother's Day and Father's Day from 9:00 a.m. to 6:00 p. m. If the holiday falls when the children are to spend time with a parent according to the regular schedule, then the children will spend time with the respective parent according to the holiday schedule. The holiday schedule with the children shall supercede the regular visitation schedule and there shall be no makeup of the regular schedule due to the holiday schedule.
 5.4 The parties shall have reasonable access to the children while they are with the other party, including free access by mail and by telephone during reasonable hours of the day and evening. Neither party has the obligation to change their schedule to accommodate telephone calls from the other party. This paragraph shall in no way be construed to require that the parties converse with each other at these times.
The court finds the following additional facts:
On January 18, 2001, the defendant brought the minor child Kayla to see the child's pediatrician, Dr. Diane L. Fountas. The office notes of Dr. Fountas, which the court finds to be factually accurate, for the January 18, 2001 visit are as follows:
 1/18/01 — Kayla Ferrucci — Kayla is here with Mom who reports about 45 min. ago pulling clothing from her mom backwards, lost her balance and hit the back of her head on a cedar chest. This was witnessed by mom. There was no loss of consciousness. CT Page 13662 Child cried immediately. She is not complaining of headache. There has been no vomiting, seizure activity. Has been behaving normally.
 P.E.: Alert, comfortable appearing child, slightly teary. Head with a 2-3 mm superficial laceration in the center of the posterior occiput. There is no edema. There is no active bleeding. Her eyes are clear and moist PERRL/TMI bilaterally. There is no discharge. Nose is normal. Mouth and throat are normal. Neck supple. Full range of motion. No point tenderness.
 IMPRESSION PLAN: Superficial laceration. Definitely would not suture this. Told Mom what to watch for if child has severe headache, if there is vomiting, seizure activity, if there is a change in behavior that she needs to give the office a call right away. In the meantime, Tylenol for pain if needed. If Kayla will allow ice to the area would be great. (Emphasis provided.)
On January 22, 2001, the plaintiff's brother Michael Ferrucci called DCF. The DCF record of that call which the court finds to factually recite that call states as follows:
Report taken on 1/22/01 @ 10:15 p. m.
 Caller is the paternal uncle. Caller wishes to remain anonymous would speak w/a DFC investigator if needed.
 Caller reports he made a report last year in regards to Emotional Neglect. Caller reports he was juggled around did not have the energy to keep calling DFC.
 Caller reports child had a huge hole on top of her head. Caller reports it was last Thursday night. Caller reports it was in child's hair very large, not bleeding. Caller did not know if wound was stitched up. Caller was @ the paternal grandparents' house visiting child was showing head to caller's son paternal grandmother. Caller reports mother took child to the doctor, unknown what doctor child was taken to. Caller reports child will not speak to caller or the paternal side of the family. CT Page 13663
 Caller reports the father stated mother lied said child fell down, then mother told another sister in law Ana, that child was giving her a hard time about clothing mother was pulling the clothes away from her, then mother let go child fell backwards hit her head. Caller reports it is unknown what child hit her head on. Caller reports mother panic may have called 911. Caller reports child was seen by the doctor or ER, caller did not have specifics. Caller reports he wishes someone would do something about all this.
 Caller reports child is not spoken to or questioned because mother has not allowed paternal family to do so.
 Caller reports father is the father to both children parents are divorced.
 Caller is unaware of any past DCF hx, except for his complaints, substance abuse, mental health, specialized needs, family resources, community services, or environmental factors.
 Caller reports mother refuses to send child to counseling.
 Caller reports mother is extremely violent, tried to jump out of a moving car a year ago, caller witnessed mother swinging like a manic @ father, also a year ago. Caller reports he has recordings of mother screaming being threatening to father, taped about 1 year ago.
 Caller reports child attends daycare @ Country Gardens in Waterbury on Country Club Rd. 2 days per week, short period of time.
The complaint regarding the problems that allegedly occurred about a year prior to the complaint being called in predate the separation agreement between the parties.
After receiving the report from Michael Ferrucci, DCF commenced its investigation. A DFC investigator spoke to the defendant on January, 25, 2001. The defendant was not informed on January 25, 2001, that the CT Page 13664 complaint had been called in by the plaintiff's brother. The DFC investigator also spoke to the plaintiff on January 25, 2001. The plaintiff informed DCF that he had no concerns with the mother being physically abusive to the children. The plaintiff also informed the DCF investigator that he had no concerns regarding the mother caring for the children. He stated that the mother was appropriate in caring for the children. The DFC investigator also contacted the child's preschool teacher and was told that the defendant was a very appropriate mother. Although the plaintiff complained by telephone to the DFC investigator of alleged emotional abuse by the defendant to the children, DCF never investigated mental abuse. The plaintiff never filed any written complaint with DFC alleging emotional abuse of the children by the defendant. He claimed to the DCF investigator that the mother was emotionally abusive to the children. The court finds that that claim is not credible.
The plaintiff's brother is not an attorney although the plaintiff's brother is married to an attorney. The plaintiff's brother testified that he did not represent to the office of Dr. Fountas that he was an attorney. The court finds that the testimony of the plaintiff's brother is not credible and further finds that his brother falsely made the representation that he was an attorney when he called the office of Dr. Fountain on January 29, 2001.
The reason the defendant took the minor child to see Dr. Fountas for the child's superficial injury was as a result of previous threats made to her by the plaintiff to attempt to obtain custody and to involve DCF in the dispute. Since the divorce, the plaintiff has continually threatened the defendant with calling the Department of Children and Families. The defendant truthfully told the plaintiff how Kayla's head injury occurred. At no time did the defendant lie regarding the circumstances that led to the child's head injury. Although Dr. Fountas recommended that the child remain at home for twenty-four hours after she was seen by Dr. Fountas on January 18, 2001, the plaintiff would not agree to that since it was his visitation date. When the defendant told Dr. Fountas that it was the plaintiff who called DCF, she reasonably believed it was the plaintiff who had made the call.
The best that can be said about the complaint made by the plaintiff's brother to DCF is that it was not only incredible but it was also not credible. As a matter of fact, the plaintiff's brother's complaint that the child had a "huge hole on top of her head" is nothing more than a pack of lies.
The office notes of Dr. Fountas of January 24 and January 25, 2001, which the court finds to be factually accurate are in part. as follows: CT Page 13665
 Mom phoned on Wednesday Jan. 24, 2001. Stated the office would be getting a call or form from DCF — father reported mom because of a fall Kayla had taken. Dr. Diane L. Fountas informed.
 1/25/01 — FERRUCCI, KAYLA — A 4 yr old patient of mine seen last wk for bumping her head on a cedar chest. It was a very superficial laceration. Apparently the father called DCF now has requested the records. The iniury is consistent with a superficial, insignificant normal childhood bump. The mother, if faulted at all, should be faulted for being over-anxious since it was very, very superficial.
 It is my opinion that the father is acting inappropriately to be calling DCF for every little bump bruise. It is my opinion that this mother is an excellent mother who, if anything, is over-concerned rather than under-concerned. If the father continues to behave this way, I do believe he is putting his children in the middle and I think that DC? should look into his behavior rather than the mother's. Also received a medical fax for Kayla for DCF. Reviewed it, filled it out said that the children are up-to-date with appropriate medical treatment 
immunizations my only concern is that the father's behavior is putting his children in the middle of a grown-up issue. Will send this back to DC?. (Emphasis provided.)
The office notes of Dr. Fountas of January 29, 2001, which the court finds to be factually accurate are in part as follows:
 1/29/01 Dad phoned on 1/26/01 and requested copy of office notes from 1/18/01. Dad wanted to find out what happened. Per Dr. Diane L. Fountain: phoned dad back and asked him to send us a written request (dad did fax us request).
 Today faxed to dad office notes from 1/18/01 
1/25/01.
 Dad phoned very angry will be placing a lawsuit against Dr. Diane L. Fountain states he never called DCF. Wanted me to get Dr. Diane L. Fountas on the CT Page 13666 phone. Told him she would not come to the phone is seeing patients but would meet with him here in the office and 5:30 tonight.
 1/29/01 Phone call from Michael Ferrucci asking to speak with Dr. Diane L. Fountain told him she was with a patient. Asked him who he was. He told me he was Rob Ferrucci's brother. He stated he will be contacting the AMA Dr. Diane L. Fountas should expect to be sued by Michael. States Michelle fabricated stories and needs a psych eval states he knows his brother did not call DCF. Told me he is "not kidding" he and his wife are attorney's. I told him I would give this message to Dr. Diane L. Fountas.
The plaintiff's brother, Michael Ferrucci, testified in this trial that when he called the office of Dr. Fountas he did not state that he would contact the American Medical Society and that he did not state that Dr. Fountas should expect to be sued by the plaintiff, Robert Ferrucci. The court finds that testimony of the plaintiff's brother is not credible and further finds that he did state to the office of Dr. Fountas that he would contact AMA and that the doctor would be sued by the plaintiff.
 1/29/01 — FERRUCCI, KAYLA — Now a 4 yr old female whose father called after receiving our records. (See note from 1/29/01, from Tammy Carrasquillo) I explained I would be happy to sit down speak with him. Father came in at 5:30 p. m. today. At that visit at 5:30, Dr. Kumar and myself met with the father in a room, and he taped our discussion. He wanted to know where I had gotten the information about DCF. I explained that we had been given the information by the mother. He advised me that he did not call DCF, and I advised that I will document same. I further advised him that no information had yet been faxed to DCF.
 I explained that my only issue was to worry about the welfare of the child/children if either parent was putting the children in the middle of grown-up issues, then that was a concern. Father said that he never had his side of the story heard. Explained that we would be happy to listen to his side of the story. I explained that I could not change my notes, however, would be happy to state that he disagreed with the note dated 1/25/2001. Initially father stated there CT Page 13667 were issues regarding the mother that he wasn't going to tell us. Upon reflection, I advise that if there were issues involving the welfare of his children we could be of help, that is what a pediatrician should do he should let us know. Our job is to not take sides with the parents but to make sure that the children are safe.
 Father stated he did not want us to be seeing his children again. I explained that I could not abandon the children and since he was only half of the input, he and his ex-wife would have to decide their children's medical care.
 I also explained that I had no trouble with both he 
his ex-wife brining the children into the office together. Although we cannot accommodate emergent sick visits around parents complex schedules, we certainly can make sure that the well visits are scheduled in advance so that both parents are here in the office. Should he choose to go elsewhere, that is certainly between he his ex-wife; however, again, until we are told otherwise, we will not abandon his children. Either parent, if putting the children in the middle of their own disputes, is inappropriate. I did make it clear that my position is that the children should never be put in the middle, they need both of their parents the parents should be very careful to keep their children out of their issues. We are willing to provide medical care to his children. Father will get back to us and hopefully the mother will as well. Note: The fax to DCF was not sent, and I will call Cecilia McCray to get another medical fax information sheet since I would like to reassess my thoughts on this. As far as I am concerned, I have no reason to suspect either parent to have put their children in the middle. Will leave this up to DCF rather than us. If we can be of any help, explained to the father that we would be happy to oblige.
 1/29/01 — FERRUCCI, KAYLA — Today I was a witness to the conversation between Dr. Fountas the biological father of Kayla. I also did participate in some of the discussion. Father came to the office today as he was upset about the documentation by Dr. Fountas. The documentation was based on the CT Page 13668 information provided by the biological mother. Father expressed concerns about the documentation as he felt that he had been singled out for criticism. It was explained to the father that the documentation was based on the information provided by the mother. That we do not have any interest in implicating any particular individual as the cause for any foreseeable problems. The primary loyalty as physician lies with the children at certain stage this may lead to differences of opinion based on ethical clinical grounds. As we haven't had any input from the father, much of the information was based on what was provided by the mother. Before the meeting I had not read the chart I have not, to the best of my knowledge, see this particular patient.
 Much of the conversation was recorded by the father as he wanted to document everything that was being spoken. So most of whatever has been stated is on tape the tape is with the father. From our side, it was stated that our primary interest is the welfare of the children both physical psychological. When differences of opinion between biological parents increase, that is bound to have some adverse impact on children this has been well stated in several studies. However, as physicians we try to do our best for the welfare of the children not take side, in any parental conflict.
 Father expressed interest, at least initially, that the children be not seen in our office he would transfer the records to a different office. As the father has joint legal custody he has to make this decision in consultation with the biological mother. __________ of the decision made by the parents we would, from our side, always wish the children well 
we'll be happy to transfer the record. in due course to the new physician. If the parents decide to stay with our office, we will make all attempts to provide coordinated care.
 Father stated that he did not call DCF this is something new which we heard from the father the same will be documented today. Towards the end of the conversation, father stated that if the children are seen in our office, he would like to be present in CT Page 13669 person. We stated that for well visits this could be arranged as such appts. are made well in advance. It is not possible to see patients after 5:00 p. m. as the last appt. is usually at 5:00 p. m. From our side, we wished the father well also stated that depending on the decision they make we would be glad to care for the children in our office or if they wish, we will transfer the records to the physician of their choice.
The office notes of Dr. Fountas of January 30, 2001, which the court finds to be factually adcurate read as follows:
 1/30/01 — FERRUCCI, KAYLA — Received a fax from DCF on 1/25/2001, referred to it in the note of 1/25/2001; although I mentioned that I sent it back, I had not sent it back. Called Cecelia McCray at DCF, phone 203-759-7023; asked her to fax me another form. Cecelia maid I did not need to fax anything back, she just wanted to know if I had any concerns about the mom being abusive I said no. Apparently, according to Cecelia, the in-laws, the father's parents, had filed a complaint or worry. Cecelia asked about the incident from 1/18, when the child had hit her head 
asked if I had any concerns I stated that I did not. Cecelia then said that the form did not need to be faxed if the mom called to tell her there is no problem, that she had spoken with the father the mother now with me.
On February 2, 2001, the Waterbury Police were called to the defendant's residence. The following is the incident and offense report from that visit which the court finds to be factually accurate:
February 2, 2001 8:17 p. m.
 On the above date time I, Off. M. Tirado, was dispatched to 30 Avon Ave. 2nd Fl. on a threatening complaint. Upon my arrival I spoke with Mrs. Michele Ferrucci — (11-21-67) of same address, who said that extranged husband threatened her today while picking up their two kids for a weekend visit. Mrs. Ferrucci said that Robert Ferrucci — (05-10-66) of 53 Westbury Park Rd., Watertown, CT arrived at her residence to pick-up their two kids — 1) Kayla Ferrucci (11-6-96) and 2) Kyle Ferrucci (6-11-99) and when the Complainant told Mr. Ferrucci that she was CT Page 13670 not giving him any clothes for the kids other than their pajamas and that he had to buy them clothes for when he had them over, he told her "I'll get you" and "I'll win". Mrs. Ferrucci stated that she took this as a threat because of his past actions and history of violence. Mrs. Ferrucci said that he left after he said that. I was able to hear Mr. Ferrucci say "I'll get you" and "I'll win" from a tape recorder the Complainant had in which she had taped their conversation. I only heard the excerpts of the two frases above mentioned. The Complainant was advised to go to the detective bureau tonight and apply for an arrest warrant but she said that she might go tonight or tomorrow. (Emphasis provided.)
The court finds that the plaintiff's testimony before the court on June 15, 2001, that he never stated to the defendant "I will get you" and "I will win" was false.
Approximately one to two weeks prior to the February 2, 2001 incident in which the police were called, the plaintiff had told the defendant that he would get sole custody and would lie and contact DCF. During the time that the plaintiff was picking up the children on February 2, 2001, he told the defendant that you are going to be a very sorry person" and "you are going to be extremely sorry" and "I will fight you to the end and I will win". The children were close by when the plaintiff made these statements. The children were also close by when he said to the plaintiff "you will pay. I will not rest one minute."
On February 7, 2001, the plaintiff wrote the following letter to Dr. Fountas:
 Robert J. Ferrucci PO Box 524 Watertown, CT 06795
February 7, 2001
Dr. Diane L. Fountas 404 Main Street Watertown, CT 06795
I find it very disturbing and extremely scary that your notes state that I am "acting inappropriately to be calling DFC" when in fact I NEVER
called DCF. You also are recommending that DCF should look into my behavior. How could you make statements about me without ever speaking to CT Page 13671 me? You take everything Michele says as if she were a credible person. Let me point out the facts: Michele LIED to you. The DCF worker informed Michele, upon meeting her, that I did not call DCF.
I also am extremely disturbed at the fact that if I was not aware of yourMISREPRESENTATIONS TO DCF you could have caused irreversible harm to the visitation that I have with my children. You clearly have crossed the line of deplorable ethical actions. Because of these facts and your biased opinion about me and my relationship with my children I am demanding the following:
 1. You are to immediately refrain from giving medical treatment to my children, Kayla and Kyle.
 2. A copy of all of my children's records and your notes by February 16, 2001.
I am also sending grievance letter to the Department of Public Health asking them to investigate your actions. And it also should come as no surprise to you that I am consulting with my attorney to pursue a civil action against you and your firm.
 YOU NO LONGER HAVE AUTHORIZATION TO TREAT MY CHILDREN. I AM A JOINT, LEGAL, CUSTODIAL PARENT AND THE LAW REQUIRES YOU TO HAVE MY PERMISSION.
You have caused me and my family extreme mental duress and stress with your past and current action.
Sincerely, Robert J. Ferrucci
On February 7, 2001, the plaintiff wrote the following letter to the defendant:
February 7, 2001 To Michele From Rob Re: Children
From this day forward every issue that I have concerning our children will be in writing. This is only to protect me and to keep you honest. I know that you know that our children are the single most important thing to me.
So this letter is for two reasons. CT Page 13672
The first issue is Dr. Fountain. Since this divorce has started Dr. F has taken a biased opinion against me. She does not even know me but some how seems to here many untruths from people about me. Attached you will see the notes that Dr. F has written about me that she almost sent to DC? and also a letter that I sent to her today. Please read them carefully and try to understand that it is not in the best interest of our children to be seen by this Doctor and nor will I allow it any further.
Second issue is schooling I have proof of you registering Kayla at Tinker. This is a contempt motion for you. You need to know that I do not agree with this nor will I allow it. At court you stated that you would move back to Watertown or put her in private schools in Waterbury. This is what I will agree with and you still plan to send Kayla to Tinker I will have to take the next step and file a contempt motion. These issues about the children are to be discussed with me and not told to me. Hopefully you can understand and do what best for Kayla without going to court. Kayla is very intelligent little girl who needs to go to a good school. I do remember moving to Watertown and it was for the school system.
Attached is a copy of:
 1. Divorce agreement highlighting that we have joint custody and joint decision-making.
 2. A list of Doctors. Please choose one and I will choose one and we will interview them both together and make a joint decision.
3. A letter to and from Fountas.
 4. School scores listed by town. Please compare Waterbury to Watertown. It's sad that you would even consider sending Kayla to Tinker.
5. Tinker School
Kayla and Kyle will always have two parents and that decisions will be made by both parents.
Rob
The office notes of Dr. Fountas of February 12, 2001, which the court finds to be factually accurate, are as follows:
CT Page 13673 2/12/2001 on 2/8/2001 Received a registered letter from father that we were not the children's physician! Could not take care of his children anymore! On 2/8/2001 we put a call in to see if children's mother was aware call made by Marie Brown-Farley PA. Mother stated she was unaware wanted us to stay her children's pediatrician she will put this in writing. Not certain where we stand legally or where children stand medically. Need to not abandon children.
On February 13, 2001, Dr. Fountas wrote the following letter to the plaintiff and the defendant:
Michele Ferrucci 30 Avon Avenue Waterbury, Connecticut 06708
Robert J. Ferrucci P.O. Box 524 Watertown, Connecticut 06795
Dear Michele Ferrucci Robert Ferrucci:
I have received correspondence from Robert J. Ferrucci dated February 7, 2001, requesting that I immediately refrain from giving medical treatment to Kayla and Kyle Ferrucci. I have also received correspondence dated February 9, 2001, from Michele Ferrucci stating that she would like me to continue providing medical care and treatment to Kayla and Kyle Ferrucci.
Although I understand that legally this office may provide medical care and treatment pursuant to the authorization of Michele Ferrucci, I believe it would be in the best interest of the children to obtain medical care from a physician that both parents trust and feel comfortable talking to and whose advice is respected. As it is apparent that I do not have the trust or respect of both parents, I feel it is not wise to continue as your children's physician. If you desire, I shall be available, professionally, to attend your children for regular treatment for fifteen (15) days after you receive this letter and for fifteen (15) days for emergency treatment, but in no event for more than thirty (30) days following the receipt of this letter. This will give you time to select a physician of your choice.
I hope that you will be able to come to an agreement as it is not in the best interests of the children to be seeing two pediatricians. CT Page 13674
Upon receipt of your written authorization, I will transfer your medical records to the designated physician.
I wish your children good health in the future.
Very truly yours,
Diane L. Fountas, M.D. DLF/jk
The office notes of Dr. Fountas of February 14 and February 15, 2001, which the court finds to be factually accurate, are as follows:
 2/14/01 Mom walked in requesting copy of children's records told mom would check with Dr. Diane L. Fountas (not in today) had mom sign release.
2/15/01 Per Dr. Diane L. Fountas ok to copy records.
 2/15/01 Same letter to both parents re finding a new pediatrician (see copy) was going to send registered mail — but will hand to each parent separately when they come in for all records.
2/15/01 Xerox entire chart to mom.
 2/15/01 records from 6/8/99 thru present handed to mom, separately, personal letter from Dr. Diane L. Fountas re: new pediatricians handed to mother. Also, told mom letter from Dr. Diane K. Fountas and she should read it.
The DCF investigator also contacted Dr. Fountas.
After the complaint was received by DCF from the plaintiff's brother, DCF received the following letter from Dr. Fountas:
 To whom it may concern, Kayla and Kyle Ferrucci are patients of mine. I understand that there is presently some disagreement between the parents. I would like to go on the record to state that these children have been well cared for. They have been brought — they have been brought by their mother to routine visits. Their mother have been — their mother has been very in tune with their medical needs and even CT Page 13675 subtle difficult observations of home, which many parents would not be able to pick up on.
 I believe that Kayla and Kyle's mother has been very — has been extraordinary mother. She is the only parent that I have had contact with and, although, I do not know the father, consequently, I cannot comment on him. I do not know that there — I do know that their mother not only loves these children deeply, but cares for them in extraordinary way, which is not only impressive to me but in today's day and age is often lacking.
 Please contact me if I could be of any further assistance.
On February 28, 2001, DCF informed the plaintiff's brother that as a result of the investigation no further intervention will be provided. DCF also informed the plaintiff and the defendant on February 28, 2001, that the case was closed at this time.
On March 9, 2001, the defendant wrote the following letter to Dr. Fountas:
March 9, 2001
Dear Dr. Fountas.
 I am writing to you about the medical care for my children. I am asking for you to please continue to provide medical care for Kayla and Kyle Ferrucci if needed until Ms. Ferrucci and myself decide on future medical care for the children. Ms. Ferrucci and her attorney have decided not to discuss this very important issue with me and to bring this matter to court. So until this issue is resolved please provide the medical care needed for my two children. If you have any further questions please call me at 860-945-9548.
 Sincerely Robert Ferrucci
On March 15, 2001, Dr. Fountas wrote the following letter to the plaintiff and the defendant:
Michele Ferrucci CT Page 13676 30 Avon Avenue Waterbury, Connecticut 06708
Robert J. Ferrucci P.O. Box 524 Watertown, Connecticut 06795
Dear Michele Robert Ferrucci
Please be advised that on March 9, 2001, I received a fax transmitted from Robert Ferrucci asking that I continue to provide medical care for Kayla and Kyle Ferrucci (if needed until Ms. Ferrucci and [Mr. Ferrucci] decide on further medical care for their children). It is my understanding that both Robert Ferrucci and Michele Ferrucci desire that this office provide medical care to Kayla and Kyle, including well visits and sick visits, until such time that the court matter is resolved.
As it remains my philosophy that there needs to be a respectful and trusting relationship between the physician, children and parents, I will only provide sick or emergency care when other staff is not available.
It is important for your children that issues of medical care be resolved expeditiously.
 Very truly yours, Diane L. Fountas, M.D. DLF/jk
The minor child Kayla Ferrucci was born on November 6, 1996 and the minor child Kyle Ferrucci was born on June 11, 1999. Kayla did not respond well to the pediatrician she had been seeing and as a result of which both the plaintiff and the defendant jointly agreed to change doctors. This change was made during the time the defendant was pregnant with the minor child Kyle. The plaintiff and the defendant both went with the minor child Kayla when she had her first physical by Dr. Fountas in approximately November 1998. The child reacted wonderfully to Dr. Fountas. Dr. Fountas has been the pediatrician for both children since Kyle's birth. Kyle suffers from reflux. The last date that Kyle was tested for reflux was December, 2000. Kyle has been eating well since December, 2000. He would vomit blood from approximately three weeks after he was born until he was about one year old.
Since their divorce, the plaintiff and the defendant have not been able to communicate. They have constantly argued regarding schooling.
The parties are no longer in agreement that joint custody is in the CT Page 13677 best interest of the minor children. The parties are unable to effectively engage in joint decision making regarding the minor children.
The plaintiff told the defendant that she should not enroll the minor child Kayla in the Waterbury school system but rather should enroll her in private school. He told her that he would contact DCF if she did not comply with his request. Approximately one week after being told this by the plaintiff, the defendant was contacted by DCF on January 23, 2001. The defendant informed the plaintiff that she was registering the minor child, Kayla in a Waterbury public school prior to the time that the child was registered. This information was given to he plaintiff in late January, 2001. After the parties were divorced on September 26, 2001, the plaintiff has continually threatened the defendant that he would obtain custody of the two children. She has never told the children that they should not visit with the plaintiff's parents.
The parties had been unable to agree as to what school the minor child Kayla should be enrolled in commencing September 2001. They are in dispute as to the reason the plaintiff has objected to the child being enrolled in the Waterbury Public School System. The defendant claims that the plaintiff did not want the child enrolled in a particular school in the Waterbury school system because of minority students who go to that school. The plaintiff denies that claim. The court finds that the plaintiff's testimony is not credible and finds that his objection to the Waterbury school that the minor child is enrolled in is as a result of the number of minority students that attend that school.
Kayla was registered in the Waterbury school system on January 25, 2001. No credible evidence has been presented as to why the child should not: be enrolled in the Waterbury public school system. When the plaintiff did not get his way regarding enrollment in the Waterbury school system and regarding other issues he would threaten the defendant with calling DCF. The Waterbury school system has recommended that Kayla repeat kindergarten because she is not socially up to par. When the defendant informed the plaintiff of this on June 7, 2001, he said he would discuss it when he was good and ready. While section 5.1 of the separation agreement the plaintiff acknowledges and consents to the children attending a Catholic grammar school, that provision does not mandate that they attend such a school. The parties have been unable to effectually communicate regarding issues of school and medical treatment. The plaintiff did not discuss with the defendant the fact that he was sending the letter to Dr. Fountas dated February 7, 2001 prior to sending the letter.
A number of allegations made by the plaintiff in his cross-motion for CT Page 13678 sole custody coded number 186 can best be described as false. He alleged in paragraph 2 that the defendant was investigated by DC? for physical and mental abuse to both children in January, 2001. The investigation by DC? was only for physical abuse and not mental abuse. He alleges in paragraph three that the DC? investigator informed the defendant that the plaintiff did not call DCF. That allegation is false. He alleged in paragraph four that Dr. Fountas decided to write a letter to DCF. No such letter was written to DCF by Dr. Fountas and the plaintiff was informed of that fact by Dr. Fountas on January 29, 2001. He alleged in paragraph 5 that Dr. Fountas and the defendant are trying to cause irreversible harm with his children to him. That allegation is false. He alleged in paragraph seven that on February 13, 2001, he received a letter from Dr. Fountas that she would no longer treat Kayla and Kyle as Dr. Fountas feels it is not in the children's best interest. That allegation, at best, can be described as twisting what Dr. Fountain in fact wrote to him. The letter from Dr. Fountain to the plaintiff dated February 13, 2001, stated that the doctor believed it would be in the best interests of the children to obtain medical care from a physician that both parents trust and feel comfortable talking to and whose advice is respected. He alleged in paragraph fifteen that he was informed by a stranger that his daughter had been registered in the Waterbury public schools. The "stranger", in fact, was his sister-in-law.
The parties entered into a stipulated agreement dated August 20, 2001, that resolved issues of payment of attorney's fees and modification of visitation. A copy of that agreement is attached to this decision. The parties further articulated that agreement in open court on the record in which both the plaintiff, the defendant and the guardian ad litem agreed that in the event the defendant were to obtain sole custody then the plaintiff's visitation was to be modified in accordance with the August 20, 2001 stipulated agreement. The parties further stipulated that in the event the plaintiff obtained sole custody then the court would enter a new visitation schedule for the defendant.
The court finds that it is in the best interests of the children to modify the existing custody and visitation orders and therefore enters the following orders:
 ORDER
a. The plaintiff's motion for sole custody is denied.
b. The defendant's motion for sole custody is granted.
 c. The plaintiff is awarded visitation in accordance with the stipulated agreement between the parties dated CT Page 13679 August 20, 2001, a copy of which agreement is attached.
AXELROD, J.
 SUPERIOR COURT OF WATERBURY STIPULATED AGREEMENT
DOCKET No.: FA 00 0157807 Date: August 20, 2000
PLAINTIFF: ROBERT J. FERRUCCI
vs.
DEFENDANT: MICHELLE I. FERRUCCI
Each motion resolved in this agreement must be addressed in separate paragraphs. The opening paragraph of each resolution must identify the motion being addressed by its 5 digit motion number. (For example: $102.00 — The defendant shall pay $100 per week child support.)
The Parties Do Hereby Agree:
1. The Plaintiff will pay all of Attorney Suzanne Snearley's fees pursuant to a payment plan acceptable to atty Snearly said plan shall be made within 30 days.
2. The Plaintiff will pay all of Dr. Fountas' bill pursuant to a payment plan acceptable to the doctor which shall be made within 30 days.
3. Attorney Porzio's fees will be the Defendant's sole responsibility.
4. The parties agree that the following modification to the divorce judgment shall be made:
— The parties shall each enjoy one week of vacation with the children during the summer months of either July or August beginning in the summer of 2002. Both parties shall give the other notice of their choice of vacation week by March 1 of each year. If both parties desire to vacation on the same week, the Mother shall have first choice in even numbered years and the Father shall have first choice in odd numbered years.
Modification of Existing Holiday Schedule in Divorce Judgment
The divorce Judgment shall be modified to read that the Mother shall CT Page 13680 enjoy Thanksgiving from 9:00 a.m. through 3:00 p. m. and the Father from 3:00 p. m. until Friday morning at 9:00 am. so long as it is Father's regular overnight Thursday night visitation on that Thanksgiving Day. If it is not Father's regular Thursday night overnight visitation, the children shall be returned to the Mother on Thanksgiving Day at 8:00 p. m.
Memorial Day shall be enjoyed in odd numbered years by the Father from 9:00 a.m. until 5:00 p. m. and even numbered years by the Mother.
Fourth of July shall be enjoyed by the Father from 10:00 a.m. until 2:30 p. m. and the rest of the day shall be enjoyed by the Mother.
Labor Day shall be enjoyed in the odd numbered years by the Mother and in the even numbered years y the Father from 9:00 a.m. until 5:00 p. m.
__________________________ __________________________ PLAINTIFF DEFENDANT
__________________________ __________________________ COUNSEL for the PLAINTIFF COUNSEL for the DEFENDANT
__________________________ FAMILY RELATIONS OFFICER
The above stipulation: IS ACCEPTED by the COURT.
Axelrod, J. Judge/Temp. Asst. Clerk